UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CGFH GAINSBORO, LLC,

    Plaintiff,

v.

REVOCOAT US, INC., and PPG
INDUSTRIES, INC.,

    Defendants.

Case No. 17-12144
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21]**

A company that is now known as PPG leased a single-tenant industrial building, or warehouse ("Property"), in Ferndale, Michigan from 2011 to 2016. The Property was owned by Centrum Officenter, LLC. In early 2017, Plaintiff CGFH Gainsboro purchased the Property. The sale agreement included any claims Centrum may have against PPG under the lease. Gainsboro is suing PPG pursuant to that lease alleging that PPG breached a host of provisions based upon its failure to maintain the Property.

PPG now moves for summary judgment. For the reasons stated below, PPG's motion will be granted in part and denied in part (ECF No. 21.)

**I.**

In January 2011, PPG's predecessor company entered into a lease with Diversified Chemical, the owner of the Property. (ECF No. 21-6.) Diversified Chemical sold the Property in 2015 to Centrum Officenter. (ECF No. 21-7.) Soon after, Centrum began looking for a buyer. (*See* ECF No. 21-8.)

On December 15, 2016, Centrum sent PPG a letter stating that PPG needed to make $484,800 worth of repairs to restore the Property to its move-in condition. (ECF No. 21-15.) PPG failed to do so. PPG surrendered the Property at the end of December 2016. (ECF No. 21-13, PageID.672.)

On January 11, 2017, Gainsboro signed a purchase agreement with Centrum to purchase the warehouse for $1,200,000. (ECF No. 21-11, PageID.598.) The agreement gave Gainsboro 60 days to inspect the Property. (ECF No. 21-11, PageID.598.) Gainsboro and Centrum finalized the sale on April 6, 2017. (ECF No. 21-19.)

Gainsboro then brought this suit alleging that, when PPG vacated the Property after the lease terminated, the Property was in substantial disrepair, not in good order and satisfactory condition, and otherwise in violation of the lease. According to Gainsboro, PPG caused over $600,000 worth of damage to the Property. PPG has a different read of the lease agreement and seeks summary judgment on Gainsboro's claims of breach of contract, waste, and private nuisance.

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

## III.

### A.

PPG first tackles Gainsboro's breach-of-contract claims. These include that PPG breached the following lease provisions: Section 7.2, which required PPG to keep the property in compliance with the law; Section 8.1, which required that PPG leave the property in as good condition as when it moved in, save normal wear and tear; Section 8.2, which required that PPG leave all fixtures in the property; Section 12.1, which required that PPG maintain the property; and Section 12.2, which required that PPG contract for quarterly maintenance of the HVAC system.

A party claiming breach of contract must establish "(1) that there was a contract, (2) that the other party breached the contract, and (3) that the party asserting breach of contract suffered damages as a result of the breach." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 921 (Mich. Ct. App. 2014). "The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007).

### 1.

PPG first argues that it is entitled to summary judgment on Gainboro's claim that PPG breached Section 8.1 ("the surrender clause") of the lease because Gainsboro has no evidence of the Property's condition in 2011 when PPG moved in. Without evidence of what the starting condition was, PPG says that Gainsboro is not able to show that it left the Property in worse condition.

Gainsboro responds that, while it does not have physical evidence of the property's condition when PPG's predecessor first moved into the premises in 2011, PPG did represent in the lease that the property was in "good order and satisfactory condition" when it moved in. This

representation comes from Section 7.1 of the lease, which states that "Tenant's taking possession of the Premises or any portion thereof shall be conclusive evidence against Tenant that the portion of the Premises taken possession of was then in good order and satisfactory condition." (ECF No. 21-6, PageID.506.) Gainsboro also has evidence that at the time it purchased the Property, there were issues with the HVAC system and fire suppression system, and various other problems with the Property. So Gainsboro believes this provides sufficient evidence to show that the Property was not in the same condition as when PPG moved in.

But PPG disputes Gainsboro's interpretation of the good-order-and-satisfactory-condition clause. PPG says it is meant to signify only that, subjectively, the Property's condition was satisfactory given the tenant's needs. It is not meant to set the benchmark upon which Section 8.1 is to be measured. In other words, that lease provision, says PPG, simply means the Property was in satisfactory condition for PPG's intended use, even if such condition would not be satisfactory to the needs of a subsequent tenant.

"Under Michigan law, the purpose of contract interpretation is 'to ascertain the intention of the parties.'" *Reardon v. Kelly Servs., Inc.*, 210 F. App'x 456, 458–59 (6th Cir. 2006) (quoting *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005)) (internal quotations omitted). "Whenever possible, the parties' intent is to be discerned from 'the language in the contract, giving it its ordinary and plain meaning if such would be apparent to a reader of the instrument.'" *Id.* (quoting *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003). "A contract provision is ambiguous if its language may reasonably be interpreted in two or more ways." *Lomree, Inc. v. Pan Gas Storage, LLC*, 499 F. App'x 417, 422 (6th Cir. 2012).

Reading the plain language of the lease agreement here leads the Court to conclude that Section 7.1 does not impact the move-in condition referenced in Section 8.1. Reading the whole of Section 7.1 gives context to the "good order and satisfactory condition" term:

> Tenant's taking possession of the Premises or any portion thereof shall be conclusive evidence against Tenant that the portion of the Premises taken possession of was then in good order and satisfactory condition. No promises of Landlord to alter, remodel, improve, repair, decorate or clear the Premises or any part thereof have been made as of the Effective Date and no representation respecting the condition of the Premises has been made to Tenant by or on behalf of Landlord.

(ECF No. 21-6, PageID.506.) This language suggests that the purpose of Section 7.1 is to provide the landlord with a defense should a tenant sue over the move-in condition of a property. Indeed, other cases interpreting similar provisions support such a reading. *See, e.g., Wilfred Labs., Inc. v. Fifty-Second St. Hotel Assocs.*, 519 N.Y.S.2d 220, 223 (1987) ("Under paragraph 20 of the lease, plaintiff's 'taking possession of the demised premises . . . shall be conclusive evidence, as against Tenant, that Tenant accepts same 'as is' and that said premises . . . were in good and satisfactory condition at the time such possession was so taken.' Thus plaintiff was free to either reject the premises and sue for damages, or accept possession and waive the infringement."); *Linear Retail Danvers #1, LLC v. Casatova, LLC*, No. CIV.A. 07-3147, 2008 WL 2415410, at *3 (Mass. Super. June 11, 2008). Further, "good order and satisfactory condition" is subjective on its face—what a chemical-company tenant finds satisfactory in a property's condition may vary drastically from what a catering-company tenant finds satisfactory. If a tenant subjectively says upon move-in, yes, the condition of this property is good enough for me, that tenant cannot later say that it was not. But that does not mean the tenant is representing that the property is in good order and satisfactory condition for all purposes. Such a reading would require a tenant to either not sign a lease until a landlord has made every single repair to a property or would make the tenant liable for any existing

issues with the property when that tenant moved out – even if those issues did not preclude the property from being in good and satisfactory condition for that particular tenant's purposes.

The contract must be read as a whole. *Royal Prop. Grp., LLC v. Prime Ins. Syndicate, Inc.*, 706 N.W.2d 426, 434 (Mich. Ct. App. 2005). And this reading of Section 7.1 coheres with Section 8.1. That section requires the tenant to return the premises "in as good condition as on the Effective Date" save ordinary wear and tear. (ECF No. 21-6, PageID.507.) If Section 7.1 bound the tenant to an objective move-in condition, Section 8.1 would say that the tenant needs to return the premises in a "good order and satisfactory condition." But it does not. Section 8.1, unlike 7.1, uses objective terminology. It provides an objective measure by which to determine damage to the property. It would be confusing indeed, given the varied uses of particular tenants, to determine whether a property is in "good order and satisfactory condition." No peeling paint? No scuff marks on the floor? No dents or cracks in the pavement?

Because the plain reading of sections 7.1 and 8.1 vision do not support Gainsboro's argument, and because Gainsboro does not have evidence of the property's condition on January 28, 2011 (when PPG's predecessor moved in), the Court finds that PPG is entitled to summary judgment on all claims brought pursuant to Section 8.1 of the lease.

**2.**

PPG next argues that the prior owner of the property failed to send it any default notices and so any claims Gainsboro makes pursuant to Sections 12.1 and 12.2 are precluded. (ECF No. 21, PageID.454–455.)

PPG argues that Section 18.1(e) of the lease entitled PPG to notice of and 30 days to cure any violation of Sections 12.1 and 12.2. And, PPG adds, it did not receive such notice. The only

communication it received, on December 15, 2016, did not allege any violations of Sections 12.1 and 12.2. (*See* ECF No. 21-15.)

Gainsboro responds that Section 18.1 requires no such thing. (ECF No. 23, PageID.939.)

So, again, the parties dispute the meaning of a contract term and the Court must look to the plain language to glean the parties' intent. *See Reardon*, 210 F. App'x at 458–59.

The provision in question reads:

Article 18

Default

18.1   Events of Default. The occurrence of any one or more of the following matters constitutes a default ("Default") by Tenant under this Lease: . . .

(e)   failure by Tenant to observe or perform any other covenant, agreement, condition or provision of this Lease, if such failure shall continue for thirty (30) days after notice thereof from Landlord to Tenant[.]

(ECF No. 21-6, PageID.513–514.)

The plain reading suggests that Sections 12.1 and 12.2 represent a "covenant, agreement, condition or provision" as that phrase is used in Section 18.1(e). And to be in "Default," the tenant must continue to fail to perform the obligations of 12.1 and 12.2 for 30 days after receiving notice from the landlord. So a tenant is not in "Default" unless and until (1) the landlord provides the tenant notice that it is failing to perform a provision under the lease and (2) the tenant fails to correct that failure within 30 days. In other words, a tenant must be given the requisite notice and opportunity to cure. *See Convergent Grp. Corp. v. Cnty. of Kent*, 266 F. Supp.2d 647, 658 (W.D. Mich. 2003).

Gainsboro's argument does not compel a different reading of the provision. Gainsboro directs the Court to look at Section 18.2, "Rights and Remedies of Landlord," which reads in part,

7

> If a Default occurs, Landlord shall have the rights and remedies set forth, which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law:
>
> (c) Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law . . . for the enforcement of any other appropriate legal or equitable remedy, including recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

(ECF No. 21-6, PageID.514–515.) Gainsboro argues that this language in Section 18.2(c) allows it to sue PPG for monetary damages stemming from its violation of Sections 12.1 and 12.2 regardless of any 30-day notice and cure period. But Section 18.2(c) is one of a list of rights and remedies for a "Default." Indeed, Section 18.2 begins, "If a Default occurs . . . ." And the "shall not operate to exclude" language only refers to "rights and remedies" and not the defaults which trigger those rights and remedies. So Section 18.2 does not rebut PPG's argument that it was entitled to a notice of default and 30-day opportunity to remedy prior to now being sued for breach of Sections 12.1 and 12.2.

The Court is required to "look[] to the contract as a whole and give[] meaning to all its terms." *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997); *see also Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003) (under Michigan law, a contract "must be construed so as to give effect to every word or phrase as far as practicable.") Section 18.1 unambiguously required a landlord to provide a tenant notice of a failure to perform under Sections 12.1 and 12.2 and 30 days to cure before a tenant would be found in "Default." *See Lomree, Inc.*, 499 F. App'x at 422. As Gainsboro has no evidence that its predecessor in interest ever sent PPG a notice about failing to perform the maintenance requirements under Sections 12.1 and 12.2, PPG is entitled to summary judgment on those claims.

**3.**

PPG next argues that it is entitled to summary judgment on Gainsboro's claim that PPG breached Section 8.2 of the lease by removing fixtures from the property. More specifically, Gainsboro alleges that PPG removed a chiller and air compressor that belonged to the former owner of the property. (ECF No. 5, PageID.164.)

PPG argues that the chiller and air compressor were trade fixtures and therefore PPG had the right to remove them upon move-out.

Property is a fixture if the following three criteria exist: (1) "annexation to the realty, either actual or constructive;" (2) "adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated;" and (3) "intention to make the article a permanent accession to the freehold." *Wayne County v. William G. Britton and Virginia M. Britton Trust*, 563 N.W.2d 674, 678 (Mich. 1997).

A trade fixture, on the other hand, "is merely a fixture which has been annexed to leased realty by a lessee for the purpose of enabling him to engage in a business. The trade fixture doctrine permits the lessee, upon the termination of the lease, to remove such a fixture from the lessor's real property." *Outdoor Sys. Advert., Inc. v. Korth*, 607 N.W.2d 729, 730 (Mich. Ct. App. 1999) (citations omitted). "A trade fixture is considered to be the personal property of the lessee." *Id.* (citing *Wentworth v. Process Installations, Inc.*, 333 N.W.2d 78 (Mich. Ct. App. 1983)).

In support of its position that the removed items were trade fixtures, PPG alleges that the chiller was used in the conduct of its business to cool its industrial mixers. (ECF No. 21-13, PageID.659.) So too the air compressor was used to open the mixer lids. (ECF No. 21-13, PageID.676.) So PPG concludes it was entitled to remove these types of fixtures upon move out.

Not so, says Gainsboro. It argues, referring to an uncited document, that the chiller was actually used for "cooling the area and not the processing equipment." (ECF No. 23, PageID.949.) It also asserts that the air compressor was attached to the fire suppression system. (ECF No. 23, PageID.949 (citing ECF No. 21-13, PageID.680.)) Because the chiller and air compressor were necessary for the building's operation more broadly, and not just PPG's business, Gainsboro says they were fixtures that needed to remain on the property.

PPG does not allege that it purchased the air compressor and chiller, as opposed to the prior owner. And Gainsboro points to evidence that the items were not just used to enable PPG to engage in its business. So given this material factual dispute as to the nature of the air compressor and chiller, the Court cannot find that PPG is entitled to summary judgment on Gainsboro's fixture claim.

**4.**

Section 7.2 of the lease required PPG to ensure that the property was in compliance with the law. Gainsboro claims that PPG breached this provision by failing to maintain the fire suppression system in accordance with National Fire Protection Association 25 (NFPA 25).

PPG asserts that this claim "is belied by the evidence." First, in October 2016, Ace Sprinkler Company made repairs to the fire suppression system and noted that "all systems left normal." (ECF No. 21-31, PageID.927.) Also, the fire chief went through the Property when PPG was vacating and "review[ed] the fire system to ensure the integrity was there." (ECF No. 21-30, PageID.896.) It is not clear, however, whether that walk through occurred before or after PPG removed one of the air compressors. (ECF No. 21-30, PageID.896–897.)

On the other hand, Gainsboro hired Field's Fire Protection, Inc. to inspect the fire suppression system in March 2017. (ECF No. 23-9.) Field's inspection revealed "various levels of

foreign material deposits" on the sprinkler heads, necessitating their replacement in order to comply with NFPA 25. (*Id.*)

That Ace left systems "normal" does not necessarily mean that the system was NFPA compliant. And the testimony does not indicate whether the fire chief checked for NFPA compliance during the walkthrough. Therefore, Gainsboro has raised a genuine issue of material fact as to whether the fire suppression system complied with the law and PPG is not entitled to summary judgment on this breach of lease claim.

**B.**

For the same reasons PPG argues that Gainsboro's contract claims fail, it argues that Gainsboro's claim of waste fails, too.

"'Waste is generally considered a tort defined as the destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property.'" *Mahrle v. Enbridge Energy Ltd. P'ship*, No. 331221, 2017 WL 2607883, at *13 (Mich. Ct. App. June 15, 2017) (quoting 8 Powell, Real Property, § 56.01, p 56-3)). "An action for waste may be maintained for damage to a building that exceeds normal wear and tear." *Id*. at *13 (citing *Anstays v. Anderson*, 160 N.W. 475 (Mich. 1916)).

PPG argues that, because Gainsboro has no proof of the property's condition when PPG's predecessor moved in in 2011, it cannot show that PPG committed waste.

But Gainsboro's claim of waste includes the fixture (i.e., PPG's removal of the chiller and air compressor) and NFPA-compliance (i.e., PPG's alleged failure to maintain the fire suppression system according to code) claims. (*See* ECF No. 5.) And neither of those claims require Gainsboro to show the move-in condition of the Property.

11

So insofar as Gainsboro's breach-of-contract claims have survived summary judgment, its waste claim survives summary judgment.

## C.

Lastly, PPG argues that it is entitled to summary judgment on Gainboro's private nuisance claim. Gainsboro's nuisance claim is based on the alleged damage that PPG caused to the Property. PPG argues that a private nuisance claim fails because there is only a single property at issue. The Court agrees.

"A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 719 (Mich. 1992). "It evolved as a doctrine to resolve conflicts between neighboring land uses." *Id*. Thus, "[u]nder Michigan law, a private nuisance applies to conditions or conduct which interfere with adjoining land." *Busch Oil Co. v. Amoco Oil Co.*, No. 94-CV-175, 1996 U.S. Dist. LEXIS 4705, at *26-27 (W.D. Mich. Feb. 20, 1996). "The Michigan Supreme Court in *Adkins*, 440 Mich. at 307-08 n.17, observed that 'courts have typically refused to allow a successor landowner to seek damages under a nuisance theory because the landowner's claim does not involve an interference with adjoining land.'" *Id*.

Gainsboro argues that the Court should not interpret the tort so narrowly because *Adkins* contemplates a nuisance covering "so many types of harm," as there are "countless ways to interfere with the use and enjoyment of land." *Id*. at 719–720. So, says Gainsboro, private nuisance should not be limited to situations where one party's use of his land interferes with another's use of her land.

But just because there are a variety of ways to harm another's property for which the law of private nuisance provides relief, does not mean that a tenant's damage to a single property at

issue constitutes a nuisance. Harm concerns *what* constitutes a nuisance—not *who* (a neighbor or former tenant) can commit a nuisance. Indeed, under Gainsboro's theory, the origin of the nuisance is also the property harmed by the nuisance. *See Busch Oil,* 1996 U.S. Dist. LEXIS 4705, at *26 (granting AMOCO's motion to dismiss nuisance claim because AMOCO's action on its own land could not constitute a nuisance as to that same land).

PPG is entitled to summary judgment on Gainsboro's private nuisance claim.

**IV.**

For the reasons stated, PPG's motion for summary judgment (ECF No. 21) is GRANTED IN PART AND DENIED IN PART. Gainsboro's claims based upon Sections 7.2 and 8.2 will survive, as will the corresponding waste claim.

IT IS SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: January 29, 2019

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record and/or pro se parties on this date, January 29, 2019, using the Electronic Court Filing system and/or first-class U.S. mail.

s/William Barkholz
Case Manager
